**In re VAN DER MOOLEN HOLDING
N.V. SECURITIES LITIGATION**

No. 03 Civ. 8284(RWS).

United States District Court,
S.D. New York.

Dec. 13, 2005.

Goodkind Labaton Rudoff & Sucharow, New York, NY (Jonathan M. Plasse, Lisa Buckser–Schulz, Louis Gottlieb, of counsel), Schiffrin & Barroway, Bala Cynwyd, PA (David Kessler, Marc I. Willner, Eric Lechtzin, of counsel), for Plaintiffs.

Friedman Kaplan Seiler & Adelman, New York, NY (Robert S. Loigman, Katherine L. Pringle, Melissa E. London, of counsel), Sullivan & Cromwell, New York, NY (Robert J. Giuffra, Jr., Stacey R. Friedman, Keith Levenberg, of counsel), for Defendants.

## OPINION

SWEET, District Judge.

Defendants Van der Moolen Holding, N.V. ("VDM Holding"), Friedrich M.J. Bottcher ("Bottcher"), Frank F. Dorjee ("Dorjee"), James P. Cleaver ("Cleaver"), and Casper F. Rondeltap ("Rondeltap")[1] have moved pursuant to Rules 9(b) and 12(b)(6) to dismiss the amended consolidated class action complaint ("the Complaint") filed by co-lead plaintiffs Elizabeth Rick and Linda Greene (the "Plaintiffs"). Defendant Van der Moolen Specialists USA, LLC ("VDM Specialists")[2] has moved separately to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6).

---

**1.** Bottcher, Dorjee, Cleaver, and Rondeltap are referred collectively herein as the "Individual Defendants."

**2.** VDM Holding, the Individual Defendants, and VDM Specialists are referred to collectively as "the Defendants."

For the reasons set forth below, the motions of VDM Holding and VDM Specialists are denied. The motions of the Individual defendants are granted in part and denied in part. Plaintiffs are granted leave to replead within thirty (30) days of entry of this opinion.

**Prior Proceedings**

This action was commenced on October 20, 2003, with the filing of a class action complaint against VDM Holding, VDM Specialists, Bottcher, Cleaver, Dorjee, and Rondeltap. By opinion and order dated April 14, 2004, co-lead plaintiffs were appointed and co-lead plaintiffs' requests with regard to the appointment of counsel were granted. *See Rozenboom v. Van Der Moolen Holding, N.V.*, No. 03 Civ. 8284(RWS), 2004 WL 816440, at *7 (S.D.N.Y. Apr.14, 2004). The Complaint was filed on September 14, 2004. On November 22, 2004, VDM Holding, Bottcher, Dorjee, Cleaver, and Rondeltap moved to dismiss the Complaint. Also on November 22, 2004, VDM Specialists moved separately to dismiss the Complaint. Both motions were heard and marked as fully submitted on March 30, 2005.

**The Parties**

Plaintiffs purchased publicly traded shares of VDM Holding ADRs between October 18, 2001 and October 15, 2003 (the "Class Period").

VDM Holding is a limited liability company organized and existing under the laws of the Netherlands. Its principal place of business in the United States is located at 45 Broadway, New York, New York.

VDM Specialists, a limited liability company organized and existing under the laws of the United States, is a majority-owned subsidiary of VDM Holding. It was established on or about July 1999, when VDM Holding acquired majority interests in, and integrated the operations of, three previously separate NYSE specialist firms. VDM Specialists is a broker-dealer registered with the SEC pursuant to Section 15(b) of the Exchange Act. As of August 31, 2003, VDM Specialists acted as the registered specialist for approximately 377 NYSE-listed securities, which then accounted for approximately 11% of the dollar volume and 12% of the share volume traded on the NYSE. According to VDM Holding's 2002 Annual Report, which is referenced in the complaint, VDM Specialists was at that time the fourth largest specialist firm on the NYSE.

VDM Holding owns 75% of VDM Specialists. The other 25% of VDM Specialists is owned by its senior managers, senior traders and other individual members of VDM Specialists. These individual members of VDM Specialists are all employees of VDM Holding.

Bottcher has been Chief Executive Officer ("CEO") and Chairman of the Management Board ("Chairman") of VDM Holding since January 2000. He has been a member of the VDM Holding Management Board (the "Board") since 1997. Bottcher is alleged to have signed certain false and misleading statements published by VDM Holding during the Class Period.

Dorjee has been the Chief Financial Officer ("CFO") of VDM Holding since January 1, 2001. He has been a member of the VDM Board since April 11, 2001. Dorjee is alleged to have signed certain false and misleading statements published by VDM Holding during the Class Period.

Cleaver has been a member of the VDM Holding Board since April 10, 2002. He has been Chairman of the VDM Specialists Board since 1998. Prior to joining VDM Specialists, Cleaver was the managing partner of an NYSE specialist firm acquired by VDM Holding in 1998. Cleaver is alleged to have signed certain false and

misleading statements published by VDM Holding during the Class Period.

Rondeltap has been a member of the VDM Specialists management committee since 2000, and he serves as VDM Specialists' spokesman. Rondeltap has been a member of VDM Holding's Board since April 9, 2003. Rondeltap is alleged to have signed certain false and misleading statements published by VDM Holding during the Class Period.

### The Action

This action is brought on behalf of all persons who purchased American Depository Receipt shares ("ADRs")[3] in VDM Holding during the Class Period and who were damaged thereby. VDM Holding ADRS are alleged to have been traded actively on the NYSE throughout the proposed class period. VDM Holding, through one of its four operational segments known as VDM Specialists, acts as a specialist firm on the New York Stock Exchange ("NYSE"). Specialist firms are responsible for maintaining a fair and orderly market in one or more specific securities and must adhere to NYSE rules that require specialist firms to refrain from trading on the specialist firm's own account when enough public investor orders exist to pair up naturally, without undue intervention.

It is alleged that during the Class Period, VDM Holding materially overstated and artificially inflated its earnings, net income, and earnings per. The Complaint alleges that VDM Holding failed to disclose that throughout the Class Period, VDM Specialists derived a substantial share of its revenue from illegal trading practices and that subsequent declines in VDM Holding's revenue were attributable to the apparent cessation of such practices.

Count One of the Complaint asserts that the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b–5 promulgated thereunder. Count Two asserts that VDM Holding and the Individual Defendants violated Section 20(a) of the Exchange Act.

### Facts

The following facts are drawn from the Complaint and do not constitute findings of the Court.

It should be noted that the Complaint's allegations concerning the general duties and obligations of a specialist, the improper trading allegedly engaged in by members of VDM Specialists and others, and the NYSE and SEC investigations into such trading practices are substantially similar to those contained in the Consolidated Complaint filed in *In re NYSE Specialists Securities Litigation*, No. 03 Civ. 8264(RWS). Those allegations are described in significant detail in a companion opinion issued today in connection with the *In re NYSE Specialists* action. *See In re NYSE Specialists Securities Litigation*, No. 03 Civ. 8264(RWS), slip op. at 11–29 (S.D.N.Y. Nov. 9, 2005). Familiarity with this companion opinion is assumed.

---

**3.** The Third Circuit has provided the following description of an ADR's structure and function:

An ADR "is a receipt . . . issued by a depository bank that represents a specified amount of a foreign security that has been deposited with a foreign branch or agent of the depository. . . . ADRs are tradeable in the same manner as any other registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the Securities Act and the Exchange Act". *Pinker v. Roche Holdings, Ltd.,* 292 F.3d 361, 367 (3d Cir.2002). ADRs have "become one of the preferred methods for trading foreign securities in the United States, with the value of ADRs bought and sold annually in the hundreds of billions." *Id.* at 367.

VDM Holding principally engages in the trading of securities on exchanges in the United States and Europe. Its NYSE specialist operations are conducted exclusively through VDM Specialists.

VDM Specialists' revenue is derived from two categories of activities: (1) executing trades as an agent, thereby earning a share of the commission on each trade that it facilitates, and (2) buying and selling stock shares on its own account, thereby capturing any profits that these trades generate. During the Class Period, VDM Holding derived a substantial majority of its revenue from VDM Specialists. For example, in 2000, 63.4% of VDM Holding's revenue was generated by VDM Specialists, and in the first six months of 2001, 72% of VDM Holding's revenue was so generated. During the Class Period, VDM Holding stated: "We depend heavily on our New York Stock Exchange specialist activities, and if they fail to grow as anticipated, it would hamper our revenue growth." (Compl. ¶¶ 42, 43.)

It is alleged that from the start of the Class Period until at least January 2003, VDM Specialists breached its obligations and duties as an NYSE specialist by: (1) causing and allowing its traders to trade ahead of its customers; (2) interpositioning itself between matching public buy and sell orders; (3) failing to properly execute limit orders; and (4) freezing the Display Book (which reflects incoming orders to the NYSE) so that VDM Specialists could complete proprietary trades before completing orders entered by public investors.

VDM Holdings made statements during the Class Period concerning its revenue and the financial performance of VDM Specialists, which are alleged to be false and misleading because they failed to disclose that VDM Specialists was engaged in illegal forms of proprietary trading. These alleged misstatements fall into two categories: (1) risk disclosures by VDM Holdings that implied that the Defendants were in compliance with NYSE rules, and (2) financial reports that failed to disclose that the revenue figures for VDM Specialists and VDM Holding were materially inflated as a result of VDM Specialists' reliance on illegal trading strategies. A description of all such statements is provided in the appendix to this opinion. Those statements relating to the revenue of VDM Specialists and VDM Holding are summarized below.

| Quarter | VDM Specialists Total Revenue | VDM Specialists Net Gain on Principal Transactions | VDM Specialists Participation [4] Rate (%) | VDM Holding Total Revenue (Millions of Euros) |
|---|---|---|---|---|
| | (Millions of Dollars) | | | |
| Q1 '01 | 65.4 | 53.4 | 31.5 | 100.7 |
| Q2 '01 | 51.7 | 41.6 | 32.1 | 81.2 |
| Q3 '01 | 57.6 | 48.0 | 31.4 | 73.9 |
| Q4 '01 | 61.8 | 51.6 | 30.7 | 89.3 |
| Q1 '02 | 56.9 | 47.7 | 34.9 | 77.9 |
| Q2 '02 | 66.4 | 55.8 | 34.5 | 86.3 |
| Q3 '02 | 69.1 | 58.1 | 34.7 | 86.0 |
| Q4 '02 | 59.7 | 49.1 | 34.4 | 77.2 |

4. The Complaint defines "participation rate" as the percentage of transactions in which VDM Specialist acted as a counterparty.

| (Improper trading alleged to have been curtailed by VDM Specialists in January 2003.) | | | | |
|---|---|---|---|---|
| Q1 '03 | 40.7 | 31.6 | 31.7 | 48.4 |
| Q2 '03 | 39.6 | 28.9 | 27.7 | 47.5 |
| Q3 '03 | 37.3 | 27.4 | 27.7 | 43.3 |

It is alleged that VDM Holding's financial statements during the Class Period violated SEC regulations and Generally Accepted Accounting Principles ("GAAP") in that they failed to: (1) disclose facts necessary to present a fair and truthful representation of VDM Specialists' trading activities; (2) provide required disclosures; and (3) identify and address those variables that were necessary for an overall understanding and evaluation of the company.

On or about January 13, 2003, the NYSE notified VDM Holding that its Division of Market Surveillance had opened an investigation of VDM Specialists' conduct in connection with individual specialists' activities on the floor of the NYSE. As summarized in the chart below, it is alleged that once VDM Specialists learned of the NYSE investigation into its specialist trading activities (in or around January 2003), it was forced to curtail its illegal trading practices, which had a material adverse effect on VDM Specialists' revenue and participation rates and also on VDM Holding's revenue. However, it is alleged that instead of informing investors about the NYSE investigation on its profitability, VDM Holding told investors that the decline in income from VDM Specialists was the result of a challenging trading environment and modest increases in trading volume.

On March 20, 2003, compliance officers of six of the seven NYSE specialists first met to discuss concerns about improper trading that had been raised in the NYSE's then-confidential investigation.

On March 31, 2003, NYSE investigators began taking depositions in connection with the specialist investigation. VDM Holding did not disclose this information to its investors.

On April 16, 2003, VDM Holding ADRs dropped 3.5% from $11.10 per share to close at $10.71 per share.

On April 17, 2003, an article on the front page of The Wall Street Journal, stated that the NYSE was probing "whether at least two of [its] largest [specialist] firms may have engaged in 'front-running,' or trading ahead of clients...." See Kate Kelly & Susanne Craig, Big Board Is Probing Specialists For Possible "Front-Running", Wall St. J., Apr. 17, 2003, at Al. That same day, the NYSE issued a one paragraph statement in which it disclosed that it had begun an investigation of several NYSE specialist firms for trading abuses. The closing price for VDM Holding ADRs on April 17, 2003 was $10.19 per share.

On April 18, 2003, The Wall Street Journal identified VDM Specialists as a target of the NYSE investigation, indicated that the investigation was focused on allegations that specialists had intentionally provided inferior stock-execution prices to certain of their customers, and stated that the SEC had launched an investigation of trading practices at VDM Specialists and other specialist firms. See Kate Kelly & Susanne Craig, NYSE Probe Reaches 5 of 7 Specialist Firms—"Front-Running" Investigation Involves Biggest Companies, Wall St. J., Apr. 18, 2003, at Cl. The following trading day, April 21, 2003, VDM Holding ADRs closed at $9.71 per share.

On September 22, 2003, *The Wall Street Journal* reported that the SEC investigation had been expanded to examine whether specialist firms, including VDM Specialists, had traded ahead of customer orders. *See* Kate Kelly, Susanne Craig & Deborah Solomon, *SEC Intensifies Inquiry at NYSE Of Trading Firms—Move Comes as Big Board Names Reed Interim Chief; Regulatory Role Questioned,* Wall St. J., Sep. 22, 2003, at A1. That day, VDM Holding ADRs closed at $13.35 per share. The prior trading day, September 19, 2003, VDM Holding ADRs closed at $13.97 per share.

On October 16, 2003, NYSE issued a press release stating that it was bringing disciplinary action and seeking fines from five specialist firms that had allegedly engaged in improper trading practices. That day, VDM Holding ADRs closed at $9.05. The day before, VDM Holding ADRs had closed at $10.61 per share.

On March 30, 2004, VDM Specialists entered into a consent decree with the SEC and a substantially similar stipulation with the NYSE. These settlements state that between 1999 and 2003, VDMS Specialists engaged in interpositioning,[5] trading ahead, and failing to execute marketable limit orders. The settlements state that this conduct, which is estimated to have resulted in approximately $34.9 million of customer disadvantage between 1999 and 2003, violated VDM Specialists' duty to serve public customer orders over its own proprietary interests. Under the terms of these settlements, VDM Specialists neither admitted or denied these findings. Nonetheless, it agreed to pay $34.9

million in restitution and $22.7 million in civil fines to a fund benefitting customers allegedly disadvantaged from 1999 to 2003. On the day that the SEC and NYSE settlements were executed, VDM Holding ADRs closed at $9.29 per share. The previous day VDM Holding ADRs had closed at $8.91 per share.

Based on the SEC and NYSE orders, Plaintiffs allege that Cleaver and Rondeltap (who were each members of VDM Specialists' management committee during some portion of the Class Period) and the other defendants had knowledge of the illegal trading practices engaged in by certain of VDM Specialists' traders. The SEC order stated, in pertinent part, that:

[c]ertain members of [VDM Specialists'] management committee engaged in interpositioning in one or more of the six stocks listed above [ (i.e., Nortel Networks Corporation, PFE, Hewlett–Packard Company, Time Warner Inc., The Walt Disney Company, and Eli Lilly & Co.) ], and these members of the management committee had the supervisory responsibility for [VDM Specialists'] trading operations on the NYSE floor, including supervising a floor captain who himself engaged in such interpositioning in one or more of the six stocks.

The NYSE provided VDMS with an examination report, dated December 26, 2001, showing that the firm had traded ahead and disadvantaged fourteen orders, including ten orders in Nortel Networks. The NYSE also provided VDMS with an examination report, dated December 30, 2002, which identified

---

**5.** According to the SEC and NYSE, VDM Specialists' interpositioning transactions were heavily concentrated in a few stocks traded by a small number of specialists. It is alleged that from 1999 through 2003, 79.73% of VDM Specialists' customer disadvantage from interpositioning occurred in six stocks Nortel

Network Corporation, PFE, Hewlett–Packard Company, Time Warner Inc., The Walt Disney Company, and Eli Lilly & Co. Nortel Networks alone accounted for about 29% of VDM Specialists' customer disadvantage from interpositioning between 1999 to 2003.

nineteen instances of trading ahead violations in Hewlett–Packard. Senior management at VDMS received these reports and reviewed them with NYSE staff.

*See* In the Matter of Van der Moolen Specialists USA, LLC, Corrected Order Instituting Administrative And Cease–And–Desist Proceedings (the "SEC Order"), Exchange Act Release No. 49,502, 83 SEC Docket 2366, 2004 WL 2093996, at ¶¶ 15–16 (Mar. 30, 2004).

In April 2005, a grand jury in this district handed down criminal indictments against certain current and former individual specialists at the NYSE alleging violations of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b–5. Since the information contained in these indictments can be judicially noticed by this Court, *see Ives Labs., Inc. v. Darby Drug Co.,* 638 F.2d 538, 544 n. 8 (2d Cir.1981), these materials will be considered in connection with this motion. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991).

### Standards

Defendants have moved for dismissal of the Complaint pursuant to Fed.R.Civ.P. 12(b)(6), 9(b), and the PSLRA. In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002) (citing *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001)).

However, "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir. 1994). Furthermore, the truth of factual allegations that are contradicted by documents properly considered on a motion to dismiss need not be accepted. *See e.g., Rapoport v. Asia Elecs. Holding Co.,* 88

F.Supp.2d 179, 184 (S.D.N.Y.2000). The following materials may be considered on a Rule 12(b)(6) motion:

(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*In re Merrill Lynch & Co., Inc.,* 273 F.Supp.2d 351, 356–57 (S.D.N.Y.2003) (footnotes omitted).

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). In other words, " 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York,* 375 F.3d 168, 176 (2d Cir.2004) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000); *accord Eternity Global Master Fund,* 375 F.3d at 176–77.

A claim under section 10(b) sounds in fraud and must therefore meet the pleading requirements of Rule 9(b), Fed. R.Civ.P. *See, e.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69–70 (2d Cir. 2001). Such a claim must also satisfy certain requirements of the Private Securities Litigation Reform Act of 1995 ("the PSLRA"). *See* 15 U.S.C. §§ 78u–4(b)(1) & 78u–4(b)(2); *see generally Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir.2000) (setting forth the heightened pleading standards of the PSLRA that must be met by a plaintiff who alleges securities fraud under Section 10(b) and Rule 10b–5); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994) (stating that "[s]ecurities fraud allegations under § 10(b) and Rule 10b–5 are subject to the pleading requirements of Rule 9(b)").

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The Second Circuit "has read Rule 9(b) to require that a complaint [alleging fraud] '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

In particular, the plaintiff must allege facts that "give rise to a strong inference of fraudulent intent." *Novak*, 216 F.3d 300, 307 (2d Cir.2000). The Second Circuit has stated that this scienter requirement can be satisfied:

"'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)).

Rule 8's general pleading requirement and Rule 9(b)'s particularity requirement must be read together. *See Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir.1990) (stating that "Rule 9(b) . . . must be read together with Rule 8(a) which requires only a 'short and plain statement' of the claims for relief"); *Credit & Fin. Corp. v. Warner & Swasey Co.*, 638 F.2d 563, 566 (2d Cir.1981) (same); *In re Initial Pub. Offering Sec. Litig. ("IPO")*, 241 F.Supp.2d 281, 327 (S.D.N.Y.2003). These two rules have been read together to mean that a plaintiff need not plead evidentiary details. *See, e.g., id.* The Second Circuit has stated that it does "not require the pleading of detailed evidentiary matter in securities litigation." *Scholastic*, 252 F.3d 63, 72.[6] Courts of this district have stated that "the application of Rule 9(b) . . . must not abrogate the concept of notice pleading." *IPO*, 241 F.Supp.2d at 327 n. 46.

## DISCUSSION

### I. Plaintiffs Have Stated A Section 10(b) Claim As To VDM Specialists, VDM Holding, And The Individual Defendants

Count I of the Complaint asserts that VDM Holding, VDM Specialists, and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b–5.

---

**6.** *See also Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir.1996) (stating that "in determining the adequacy of a complaint under [Rule 9(b)], we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence").

Section 10(b) provides in pertinent part as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b–5 provides in pertinent part as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

"The language of Section 10(b) and Rule 10b–5 does not explicitly create a private right of action. In fact, the legislative history fails to indicate whether Congress even contemplated creating such a right. . . . Nevertheless, courts long have held that a private right of action was indeed created." *Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 31 (2d Cir.2004).

To state a claim under Section 10(b) and Rule 10b–5 a plaintiff must plead that the defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff[ ] relied; and (5) that plaintiff['s] reliance was the proximate cause of [the] injury." *In re Livent, Inc. Sec. Litig.*, 78 F.Supp.2d 194, 213 (S.D.N.Y.1999).

### A. *Plaintiffs Properly Relied on Group Pleading*

As an initial matter, it is determined that Plaintiffs' Section 10(b) claim properly relied on group pleading.

■ The group pleading doctrine "allows plaintiffs to 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.'" *Polar Int'l Brokerage Corp. v. Reeve*, 108 F.Supp.2d 225, 237 (S.D.N.Y.2000). However, the doctrine "is extremely limited in scope. Courts in the Second Circuit and elsewhere have construed the doctrine as applying only to clearly cognizable corporate insiders with active da-

ily roles in the relevant companies or transactions." *Id.* (citing *Ouaknine,* 897 F.2d at 80; *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1249 (2d Cir.1987); *Powers v. Eichen,* 977 F.Supp. 1031, 1041 (S.D.Cal.1997)); *see also In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741, 767–68 (S.D.N.Y.2001).

It has been argued that the group pleading doctrine has not survived the particularity requirements imposed by the PSLRA. *See, e.g., Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 364–65 (5th Cir.2004) (stating that the group pleading doctrine "cannot withstand the PSLRA's specific requirement that the [misstatements] be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'") (quoting 15 U.S.C. § 78u–4(b)); *In re Cross Media Marketing Corporation Securities Litigation,* 314 F.Supp.2d 256, 262 (S.D.N.Y. 2004) (stating that the PSLRA pleading requirements "counsel[ ] against group pleading in actions arising in securities fraud cases...."); *Bond Opportunity Fund v. Unilab Corp.,* No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) (stating that the PSLRA has eliminated the group pleading doctrine with respect to corporate directors).

The majority rule in this district is that the group pleading doctrine has survived the PSLRA. *See, e.g., In re AOL Time Warner, Inc. Securities and "Erisa" Litigation,* No. 02 Civ. 5575(SWK), 2004 WL 992991, at *17 (S.D.N.Y. May 5, 2004) (holding that "[w]ith respect to group-published documents such as prospectuses, plaintiffs may rely on a presumption that the group-information is the collective works of those individuals" directly involved in the day-to-day affairs of the corporation); *In re Emex Corp. Sec. Litig.,* No. 01 Civ. 4886(SWK), 2002 WL 31093612, at *7 n. 3 (S.D.N.Y.2002) (stating that "[n]othing in the PSLRA has altered the group pleading doctrine"); *In re American Bank Note Holographics, Inc. Sec. Litig.,* 93 F.Supp.2d 424, 442 (S.D.N.Y.2000) (stating that "[i]t is well settled that plaintiffs may engage in ... group-pleading under 10(b) and Rule 10b–5; nothing in the PSLRA has altered that doctrine"); *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999) (stating that "[t]he PSLRA has not altered the group pleading doctrine").

This Court has previously taken the position that the group pleading doctrine remains viable even after the enactment of the PSLRA. *See Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Investments Ltd.,* 205 F.Supp.2d 243, 253 (S.D.N.Y. 2002); *In re Livent, Inc. Sec. Litig.,* 78 F.Supp.2d 194, 219 (S.D.N.Y.1999) (quoting *In re Oxford Health Plans,* 187 F.R.D. at 142). Since there is no dispute that the Individual Defendants—all of whom were officers and/or members of the VDM Holding management board during the Class Period—were clearly cognizable corporate insiders with active daily roles in the company, the group pleading doctrine is applicable in this case.

### B. *The Complaint Properly Alleges That The Statements At Issue Were False and Misleading*

■ To plead a Section 10(b) claim, a complaint must describe with particularity each allegedly fraudulent statement and explain why it is fraudulent. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2d Cir.1995) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.

1993)). Defendants argue that Plaintiffs have failed to allege any such misstatements with requisite particularity. As described above, the alleged misstatements generally fall into two categories: (1) warnings concerning the potential legal and regulatory risks confronting VDM Specialists that allegedly failed to disclose the actual occurrence of such risks, and (2) statements concerning the financial performance of VDM Holding and VDM Specialists that allegedly failed to disclose that VDM Specialists' revenue had been generated, at least in part, by trading practices that violated NYSE rules.

■ Defendants argue that the first category of alleged misstatements—*i.e.,* VDM Holding's warnings concerning the potential legal and regulatory risks confronting VDM Specialists—are non-actionable as a matter of law. Although the Second Circuit previously has held that cautionary statements concerning forward-looking statements cannot insulate a defendant from potential liability for failure to disclose known material, adverse facts, *see Rombach,* 355 F.3d at 173, it has not had occasion to consider whether cautionary statements are themselves actionable under Section 10(b). There is a split in authority among those courts that have considered the issue. *Compare Voit v. Wonderware Corp.,* 977 F.Supp. 363, 371 (D.Pa.1997) (holding that under proper circumstances, cautionary statements are actionable pursuant to Section 10(b)), *with Zeid v. Kimberley,* 930 F.Supp. 431, 437 (N.D.Cal.1996) (holding that warnings in a 10–Q report concerning adverse factors that could effect company earnings are not actionable as a matter of law).

The better rule is the one adopted by the *Voit* court, which reasoned that " 'to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavor-

able events to happen when they have already occurred is deceit.' " *Voit,* 977 F.Supp. at 371 (quoting *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 710 (3d Cir.1996)). The Second Circuit has expressed a similar view. *See Rombach,* 355 F.3d at 173 (stating that that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").

Based on the foregoing, it is determined that under certain circumstances, cautionary statements can give rise to Section 10(b) liability. Here it is alleged that at the time that VDM Holding was warning investors about regulatory risk, it knew or was recklessly ignorant of the fact that VDM Specialists' employees were violating NYSE rules. Therefore, VDM Holding's cautionary statements concerning the risks associated with the misconduct of its employees are actionable pursuant to Section 10(b).

■ Defendants argue that the second category of alleged misstatements—*i.e.,* that VDM Holding's financial statements failed to disclose that VDM Specialists' revenue had been generated, at least in part, by trading practices that violated NYSE rules—are non-actionable because federal securities laws do not require a company to accuse itself of wrongdoing. In support of this argument, Defendants cite *In re Citigroup, Inc. Sec. Litig.,* 330 F.Supp.2d 367 (S.D.N.Y.2004) (holding that defendant was not subject to Section 10(b) liability for incurring and not disclosing litigation risks associated with its securities analyst and investment banking businesses). However, the better view is the one expressed by the court in *In re Providian Fin. Corp. Sec. Litig.,* 152 F.Supp.2d 814 (E.D.Pa.2001). The *Providian* court held that although a defendant does not have a Rule 10b–5 duty to speculate about the risk of future investigation or litiga-

tion, if it puts the topic of the cause of its financial success at issue, then it is "obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information." *Id.* at 824–25 (citing *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 281–82 (3d Cir.1992); *United Paperworkers Inter'l Union v. Int'l Paper Co.,* 801 F.Supp. 1134, 1143 (S.D.N.Y.1992)).

Here, the Complaint alleges that the Defendants made numerous statements during the Class Period concerning the sources and significance of the revenue generated by VDM Specialists. For example, in August 2002, Bottcher stated, "[i]n exceedingly turbulent market circumstances we were able to maintain our second quarter result at almost the level we achieved in the first quarter. The development of our NYSE business showed once again that trading volumes and price volatility determine our opportunities to trade." (Press Release, VDM Holding, "Van der Moolen earns second quarter, 2002 net income of $16.9 million" (Aug. 1, 2002), *reprinted in* the 08/08/02 Form 6–K, at 2.) Statements such as these put the sources of VDM Specialists revenue at issue. Under the circumstances, the alleged failure to disclose the true sources of such revenue could give rise to liability under Section 10(b).

Based on the foregoing, it is determined that Plaintiffs have adequately alleged that the statements at issue were false and misleading.

### C. *The Alleged Misstatements Are Publicly Attributed to VDM Specialists*

■ VDM Specialists asserts that pursuant to the Supreme Court's holding in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S.

164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), it cannot be subject to Section 10(b) liability for statements made by VDM Holding, its corporate parent. As stated by the Second Circuit,

> [i]n *Central Bank,* the Supreme Court held that private civil liability under § 10(b) applies only to those who "engage in the manipulative or deceptive practice," but not to those "who aid and abet the violation." [511 U.S. at 167, 114 S.Ct. 1439]. The Court observed that "[a]iding and abetting is a method by which courts create secondary liability in persons *other than* the violator [or violators] of the statute." [*Id.* at 184, 114 S.Ct. 1439] (quotation marks omitted) (emphasis added).

*SEC v. U.S. Envtl. Inc.,* 155 F.3d 107, 110–111 (2d Cir.1998).

In the wake of *Central Bank,* the Second Circuit adopted a bright-line rule that in order to state a Section 10(b) cause of action based on an alleged misstatement, the plaintiff must allege that the defendant made a false or misleading statement. *See Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir.1998) (affirming dismissal of 10b–5 claim against company's auditor for approving false and misleading financial figures that were subsequently disseminated by the company) (quoting *Shapiro v. Cantor,* 123 F.3d 717, 720 (2d Cir.1997)). The *Wright* court stated that while the plaintiff need not allege that the defendant directly communicated the misrepresentation to investors, it is necessary that "the misrepresentation ... be attributed to [the defendant] at the time of public dissemination, that is, in advance of the [plaintiff's] investment decision." *Id.*

This bright-line public attribution rule notwithstanding, a subsequent Second Circuit panel held that under proper circumstances, a defendant can be held liable pursuant to Section 10(b) for a false and

misleading statement even if the statement at issue was not attributed to the defendant at the time of its public dissemination. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75–76 (2d Cir.2001) (holding that a complaint properly pled primary violation of Section 10(b) by company's vice president where facts were alleged demonstrating that: (1) the company had disseminated false and misleading statements to its investors; (2) the defendant had primary responsibility for the company's communications with investors and securities analysts; and (3) the defendant was "involved in the drafting, producing, reviewing and/or disseminating of false and misleading statements").

The *Scholastic* decision does not refer to *Wright*, and no subsequent Second Circuit panel has attempted to synthesize the two decisions. Some district courts have taken the position that *Scholastic* did not significantly alter the public attribution rule articulated *in Wright*. *See, e.g., In re Parmalat Sec. Litig.*, 376 F.Supp.2d 472 (S.D.N.Y.2005) (stating that the *Scholastic* court "did not question, let alone purport to set aside, the attribution rule set forth in *Wright* ... "). Other courts have adopted the view that *Scholastic* relaxed *Wright's* public attribution requirement. *See, e.g., SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F.Supp.2d 454, 466 (S.D.N.Y.2004).

A particularly useful synthesis of the two cases can be found in *In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 330–32 (S.D.N.Y.2004). Based on a close reading of *Wright* and *Scholastic*, the *Global Crossing* court provided the following restatement of *Wright's* public attribution rule:

> [A] plaintiff may state a claim for primary liability under section 10(b) for a false statement (or omission), even where the statement is not publicly attributed to the defendant, where the defendant's participation is substantial enough that s/he may be deemed to have made the statement, and where investors are sufficiently aware of defendant's participation that they may be found to have relied on it as if the statement had been attributed to the defendant.

*Id.* at 332 (citing *In re Lernout & Hauspie Sec. Litig. v. Lernout*, 230 F.Supp.2d 152 (D.Mass.2002)).

Pursuant to *Wright, Scholastic*, and *Global Crossing*, dismissal of Plaintiffs' Section 10(b) misrepresentation claim against VDM Specialists is not warranted. Plaintiffs have specifically alleged that VDM Holding's SEC filings and press releases, in some instances, clearly identified VDM Specialists as the source of the information concerning revenue and earnings attributable to its NYSE specialist operations at the time of their public dissemination. Defendants are correct in their assertion that Plaintiffs have not alleged any facts demonstrating that VDM Specialists participated in any way in the drafting, producing, reviewing and/or disseminating of the alleged misstatements. However, the defendant need not directly communicate the misrepresentation to plaintiffs in order to be held liable under section 10(b). *See Shapiro*, 123 F.3d at 720. In these instances, the public was made aware that the misstatements were attributable to VDM Specialists, and VDM Specialists knew or should have known that the investing public would rely upon them. Therefore, under *Wright*, to the extent that plaintiffs' claims allege that the misrepresentations were publicly attributed to VDM Specialists, they have adequately stated a 10b–5 claim against VDM Specialists.

Plaintiffs also contend that even where VDM Holdings did not clearly attribute the alleged misstatements to VDM Spe-

cialists, VDM Specialists may be held primarily liable for the statements disseminated by VDM Holding where it is shown that it was "the original and knowing source of a misrepresentation and that [it] knew or should have known that the misrepresentation would be communicated to investors." *In re Kidder Peabody Sec. Litig.,* 10 F.Supp.2d 398, 407 (S.D.N.Y. 1998) (holding that a corporate subsidiary could be held primarily liable under Section 10(b) for statements made by the corporate parent where it was alleged that the subsidiary was the "original and knowing source" of the misstatements). The facts at issue here closely mirror those the *Kidder Peabody* court confronted. As in *Kidder Peabody,* "there is no dispute that [VDM Specialists] provided [VDM Holding] with financial data on a quarterly basis and that the data was incorporated in [VDM Holding's] financial statements and quarterly and annual reports." *Id.* at 407. When VDM Holding reported VDM Specialists principal trading revenues, it was the "mere" conduit through which the information was disseminated. *Id.*

It should be noted that *Kidder Peabody* was decided prior to *Wright* and *Scholastic,* and as such, its continued viability has been called into question. It is determined, however, that regardless of the weight that should be accorded *Kidder Peabody,* Plaintiff's have adequately pled a Section 10(b) claim against VDM Specialists in accordance with *Central Bank, Wright,* and *Scholastic.* VDM Specialists made material misstatements attributable to it at the time of dissemination upon "which a purchaser or seller of securities relied." *Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439.

It is noteworthy that VDM Specialists is the subsidiary through which VDM Holdings conducts all of its specialist operations on the NYSE. (*See* Compl. ¶ 3). Under

the circumstances, the misstatements— namely quarterly and annual reporting of principal trading revenues and profits for VDM Holding's specialist activity—could have come only from VDM Specialists. In other words, when VDM Holding disseminated financial information to the public regarding its specialist operations, it related only to the activity of VDM Specialists and could have been provided only by VDM Specialists. Additionally, because VDM Holding referred only to the activity of VDM Specialists in reporting its specialist earnings, investors may be deemed to have been "sufficiently aware of [VDM Specialists'] participation that they may be found to have relied on it as if the statement[s] had been publicly attributed to [it]." *Global Crossing,* 322 F.Supp.2d at 332.

Under these facts, it is reasonable to infer that VDM Specialists' financial data were incorporated directly into VDM Holding's public statements regarding the earnings of its specialist operations. Therefore, even where VDM Holding failed to explicitly identify VDM Specialists as the source of the information concerning revenue and earnings of its specialist operations, the misrepresentations may be constructively attributed to VDM Specialists. *See id.* at 333 n. 14 (noting that a rule of constructive attribution comports with the Second Circuit's emphasis on reliance). To hold otherwise would enable parent companies to create subsidiaries under which all of its business would be conducted and then to shield the subsidiaries from section 10(b) liability by disseminating the subsidiary's false information. *See id.* at 333 (holding that the "strict requirement of public attribution would allow those primarily responsible for making false statements to avoid liability by remaining anonymous and thus would place a premium on concealment and subterfuge rather than on compliance with the federal

securities laws." (internal quotations and citations omitted)).

■ In the alternative, Plaintiffs argue that VDM Specialists can be found primarily liable pursuant to Section 10(b) for engaging in a scheme to defraud investors. Plaintiffs argue that they have properly alleged that VDM Specialists' traders engaged in a scheme to defraud certain of their customers and that the holders of VDM Holding's ADRs were thereby indirectly harmed. The underlying scheme has been summarized as follows:

> [C]ertain specialists at [VDM Specialists] engaged in ... unlawful proprietary trades with scienter, violating their implied representations to public customers that they were limiting dealer transactions to those reasonably necessary to maintain a fair and orderly market. In those instances, individual specialists at [VDM Specialists] violated Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. Under Section 15(b)(4)(E) of the Exchange Act, VDMS failed reasonably to supervise those individual specialists with a view to preventing their violations of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. VDMS also violated NYSE Rules 92, 104, 123B, 342, 401 and 476.

(SEC Order at ¶ 2.) Such allegations may well be adequate to state a 10(b) fraudulent scheme claim against VDM Specialists. However, these plaintiffs lack standing to assert that claim. It is axiomatic that in order to have standing, "a 10b–5 plaintiff in a private damages action must have been either a purchaser or seller of the securities that form the basis of the ... deceptive conduct." 2 Thomas Lee Hazen, *The Law of Securities Regulation* § 12.7[1] (5th ed.2005); *see also Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 395 F.3d 25, 37 (2d Cir.2005) (citing *Blue Chip Stamps v. Manor Drug Stores,*

421 U.S. 723, 754–55, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461, 463–64 (2d Cir. 1952)). Here, Plaintiffs allege only that they were buyers of VDM Holding ADRs. They have not, and cannot, allege that they were customers defrauded by VDM Specialists' improper proprietary trading. Therefore, Plaintiff's fraudulent scheme claim asserted against VDM Specialists fails as a matter of law.

### D. *The Complaint Properly Alleges Scienter*

As noted above, in the context of Section 10(b), Plaintiffs may satisfy the scienter requirement by alleging facts showing that the defendant had the motive and the opportunity to commit the fraud or facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *See Acito,* 47 F.3d at 52.

### 1. *Plaintiffs Properly Allege Recklessness On The Part Of VDM Holding, VDM Specialists, And The Individual Defendants*

■ Plaintiffs contend that the Complaint properly alleges conscious misbehavior and recklessness on the part of VDM Holding, VDM Specialists, and the Individual Defendants. The Second Circuit has stated that "conscious misbehavior" encompasses "deliberate illegal behavior" such as insider trading or knowing sale of company stock at an unwarranted discount. *Novak,* 216 F.3d at 308. In the context of securities fraud claims, the Second Circuit has defined "recklessness" as an "egregious refusal to see the obvious, or to investigate the doubtful" *Chill,* 101 F.3d at 269 (quoting *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989) (internal quotations omitted)). The Second Circuit has "found allegations of recklessness to be sufficient

where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak,* 216 F.3d at 308–09 (citing, *inter alia, SEC v. McNulty,* 137 F.3d 732, 741 (2d Cir.1998) (holding that the pleading standard was met where the defendant allegedly included false statements in SEC filings that were so obviously suspicious that outside counsel had recommended against their inclusion)); *see also In re WorldCom, Inc. Sec. Litig.,* 346 F.Supp.2d 628, 672 (S.D.N.Y.2004) (stating that "in an attempt to demonstrate recklessness, plaintiffs in Section 10(b) cases often assert that a defendant ignored 'red warning flags' of another actor's wrongdoing") (citing *Chill,* 101 F.3d at 269;[7] *In re Philip Servs. Corp. Sec. Litig.,* No. 98 Civ. 0835(MBM), 2004 WL 1152501, at *9 (S.D.N.Y. May 24, 2004); *In re Complete Mgmt. Inc. Sec. Litig.,* 153 F.Supp.2d 314, 334 (S.D.N.Y.2001)).

In order to establish scienter on the part of VDM Specialists, Plaintiffs allege that VDM Specialists engaged in "deliberate illegal behavior" of which VDM Specialists was aware early in the Class Period. According to Plaintiffs, VDM Specialists' "deliberate illegal behavior" is demonstrated by the SEC Order, which recounts thousands of instances throughout the Class Period in which VDM Specialists engaged in front-running, trading ahead, inter-positioning, and other forms of manipulative and deceptive trading practices. These allegations are buttressed by Plaintiffs' allegations that VDM Specialists was alerted early in the Class Period that its specialists were engaging in fraudulent specialist trading. Specifically, Plaintiffs allege:

> [t]he NYSE provided VDM [Specialists] with an examination report, dated December 26, 2001, showing that the firm had traded ahead and disadvantaged fourteen orders, including ten orders in Nortel Networks. The NYSE also provided VDM [Specialists] with an examination report, dated December 30, 2002, which identified nineteen instances of trading ahead violations in Hewlett Packard.

SEC Order at ¶ 16. The allegation that VDM Specialists was specifically put on notice of the very conduct that resulted in the fraudulent overstatement of VDM Specialists'—and therefore VDM Holdings—revenues and earnings is sufficient to satisfy recklessness on the part of VDM Specialists.

In order to establish scienter on the part of VDM Holding and the Individual Defendants, Plaintiffs argue, in essence, that the Complaint properly alleges that the VDM Holding Defendants ignored red flags concerning NYSE rule violations by its subsidiary. First, it is alleged that Cleaver, who is alleged to have signed certain of the VDM Holding's false and misleading statements during the Class Period, was chairman of the VDM Specialists' management committee and that he became a member of VDM Holding's six-member[8] management board on April 10, 2002. Second, it is alleged that Rondeltap, who is alleged to have signed certain of VDM Holding's false and misleading statements during the

---

7. It should be noted that the *Novak* court held that the mere failure of a "parent company to interpret extraordinarily positive performance by its subsidiary ... as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws." *Novak,* 216 F.3d at 309 (citing *Chill,* 101 F.3d at 269–70).

8. The size and structure of the VDM Specialists management committee is described in the Form 20–F registration statement. (*See* 10/15/01 Form 20–F Registration Statement, at 45.)

Class Period, was a member of VDM Specialists' management committee since 2000, and that he became a member of VDM Holding's management board on April 9, 2003. Third, it is alleged that the SEC determined: (1) that certain members of the VDMS Specialists' management committee had engaged in interpositioning; (2) that on December 26, 2001, the NYSE provided VDM Specialists with an examination report documenting instances in which VDM Specialists traders had traded ahead of orders involving shares of Nortel Networks Corporation; (3) that on December 30, 2002, the NYSE provided VDM Specialists with an examination report documenting instances in which VDM Specialists traders had trading ahead of orders involving shares of common stock of Hewlett–Packard Company; and (4) that VDM Specialists' senior management received these examination reports and reviewed them with NYSE staff. Fourth, it is alleged that VDMS Specialists operations accounted for the vast majority of VDM Holding's revenue.

Drawing all reasonable inferences in favor of the Plaintiffs, the Complaint adequately alleges that each of the two NYSE examination reports constituted red flags suggesting the possibility that a significant portion of VDM Specialists' revenue from principal transactions might be derived from trades that violated NYSE rules.[9] The Complaint also adequately alleges that Cleaver and Rondeltap, who sat on VDM Specialists' six-person management committee throughout the Class Period, had been made aware of (or had access to) the information contained in the examination reports. Finally, recklessness can be in-

ferred from the Complaint's allegations that upon joining the VDM Holding management board, Cleaver and Rondeltap each acquired the authority to raise questions and voice doubts concerning the validity of VDM Holding's financial statements.

Defendants argue that the NYSE examination reports were legally insufficient to serve as red flags of the securities fraud alleged in the Complaint—*i.e.*, a scheme to defraud holders of VDM Holding's ADRS. The law, at least in this circuit, imposes no such requirement that a red flag reveal to a defendant all aspects of a given fraud. Rather, the *sine qua non* of red flags are "facts which come to a defendant's attention that would place a reasonable party in defendant's position 'on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'" *In re WorldCom, Inc. Sec. Litig.*, 346 F.Supp.2d 628, 672 (S.D.N.Y.2004) (quoting *In re Sunterra Corp. Sec. Litig.*, 199 F.Supp.2d 1308, 1333 (M.D.Fl.2002)). Here, it has been adequately alleged that the NYSE examination reports provided reasonable notice that the revenue figures disseminated by VDM Holding to its investors included some non-negligible quantity of revenue generated through trades that violated NYSE rules.

Relying on two cases from this district, *see In re Philip Servs. Corp.*, 383 F.Supp.2d 463 (S.D.N.Y.2004) and *In re Leslie Fay Companies, Inc.*, 871 F.Supp. 686, 698–99 (S.D.N.Y.1995), *modified on other grounds*, 918 F.Supp. 749 (S.D.N.Y. 1996), Defendants argue that the examination reports could not have constituted red

9. As stated by the SEC:
[t]he reports from the NYSE were indications of misconduct and should have prompted the firm to inquire into whether the improper trading was more widespread and serious. In large organizations such as

[VDM Specialists], it is especially imperative that those in authority exercise particular vigilance when indications of irregularity reach their attention.
(03/30/04 SEC Order at ¶ 36.)

flags because they constituted mere warning signs that VDM Specialists were engaged in illegal trading. As an initial matter, it should be noted that the Complaint does not allege that the examination reports merely warned that employees of VDM Specialists *might* be engaged in trading practices that violated NYSE rules. Rather, they are alleged to have documented numerous specific instances in which such rules were violated. Furthermore, neither the *Philip Services* court nor the *Leslie Fay* court articulated any rigid distinction between "warning signs" and "red flags." Rather, each court evaluated the complaint to determine whether the plaintiff had properly alleged that the defendant ignored obvious signs of fraud. Here, Plaintiffs have adequately alleged that Cleaver and Rondeltap ignored obvious signs that VDM Holding's financial statements were false and misleading to the extent that they failed to disclose that some portion of VDM Specialists' revenue generated by trades that violated NYSE rules.

Defendants also argue that Plaintiffs have failed to adequately allege that the information contained in the examination reports was known to Cleaver and Rondeltap. Defendants point out that the Complaint contains no allegations that such information was ever directly communicated to Cleaver and Rondeltap. Rather, it must be inferred from the facts alleged (particularly the fact that NYSE officials discussed each of the examination report with individual members of the VDM Specialists' management committee) that the information contained in the examination reports was brought to their attention or made available to them. Defendants argue this court's decision in *In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 603(RWS), 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004) renders that seemingly reasonable inference impermissible. In *Aegon*, the Plaintiffs failed to identify any specific documents or any specific pieces of information that would have given defendants' notice that the company's public statements were false and misleading. The *Aegon* plaintiffs argued unsuccessfully that despite their failure to identify any specific documents or reports that could be considered red flags, recklessness had been properly pled based on their general allegations that the defendants' senior positions in the company gave them access to "adverse undisclosed information." *Aegon* stands for the proposition that recklessness cannot be alleged merely by stating that based on a defendant's position in a company it is likely that he or she had access to unspecified nonpublic adverse information. *Id.* (citing *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527(DLC), 2003 WL 21250682, at *14 (S.D.N.Y. May 29, 2003)); *see also In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 Civ. 1865(HB), 1998 WL 283286, at *6 (S.D.N.Y.1998) (rejecting plaintiff's theory that based solely on defendants' membership on certain boards of directors, they "must have known the true seriousness of [a company's] problems"). Neither *Aegon* nor any of the other cases described above provide support for the proposition that in order to allege adequately that a defendant has ignored red flags, plaintiff must allege with particularity that the defendant engaged in the physical act of reading a report. In contrast to *Aegon*, the fact that there were reports concerning illegal trading and that these reports were available to certain members of the VDM Specialists' management committee support a reasonable inference that Cleaver and Rondeltap either were aware of or had access to the NYSE examination reports and the information contained therein.

However, the above-described allegations concerning the examination reports

fail to allege recklessness on the part of Bottcher and Dorjee. Even though the group pleading doctrine applies in this case, allegations of Rondeltap's and Cleaver's reckless disregard of red flags cannot be imputed to Bottcher and Dorjee. *See, e.g., In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546(WHP), 2004 WL 2190357, at *15 (S.D.N.Y. Sept.30, 2004) (stating that even where statements are imputed to all defendants pursuant to the group pleading doctrine, "plaintiffs must still establish scienter as to each defendant") (citing *Steed Fin. LDC v. Nomura Sec. Intern., Inc.*, No. 00 Civ. 8058(NRB), 2004 WL 2072536, at *5 (S.D.N.Y. Sept.14, 2004)); *see also In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ. 3111(RWS), 2005 WL 225288, at *11 (S.D.N.Y. Feb.1, 2005).

Defendants also argue that Plaintiffs have not adequately pled recklessness, arguing that "plaintiffs' conclusion that VDM Holding or the Individual Defendants should have detected an improper source of revenue alleged to average such a small portion of VDM Holding's revenues—less than 0.56 percent—is legally untenable." Indeed, the Second Circuit has recognized that the magnitude of fraud is relevant in weighing an alleged inference of recklessness. *See, e.g., Novak*, 216 F.3d at 309 (holding that "the failure of a parent company to interpret extraordinarily positive performance by its subsidiary—even the 'unprecedented and dramatically increasing profitability' of a particular form of trading—as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws." (quoting *Chill*, 101 F.3d at 269–70)). This argument fails. Defendants' argument improperly assumes that the fraudulent activity cited by the SEC and the NYSE constitutes the full scope of the improper trading activities engaged in the VDMS during the Class Period. Plaintiffs have not alleged that the trades cited by the

SEC and the NYSE comprise the entirety of Defendants' wrongdoing. Accordingly, Defendants' argument that the minimal magnitude of wrongdoing negates an adequate allegation of recklessness fails.

Finally, the Complaint alleges that on January 13, 2003, VDM Specialists received written notice that the NYSE Division of Market Surveillance had opened an investigation into its specialist activities on the floor of the NYSE. It is alleged that as soon as the Defendants were notified about the investigation, they were forced to curtail the abusive trading practices that had been taking place at VDM Specialists, and as a result, VDM Specialists' revenue production fell off precipitously. It is alleged that instead of disclosing the real reason for the decline in VDM Specialists' revenue, Bottcher and Dorjee falsely represented that such declines were temporary and due to poor market conditions. Plaintiffs urge the Court to assume that Bottcher and Dorjee, who are based in the Netherlands, would have been informed of the NYSE investigation on January 13, 2003. Defendants argue that these allegations are conclusory and do not properly allege that Bottcher and Dorjee acted with fraudulent intent.

Here, it is undisputed that on April 17, 2003, the NYSE issued a one-paragraph statement disclosing that it had launched an investigation of several NYSE specialist firms. It is similarly undisputed that on April 18, 2003, *The Wall Street Journal* reported that VDMS and other specialist firms were the subject of an investigation by the NYSE into illegal trading practices on the floor of the NYSE. Given VDM Holding's reliance on revenue generated by its Wall Street-based specialists firm, it is reasonable to infer that Bottcher and Dorjee kept abreast of company news that appears in *The Wall Street Journal*. Therefore, the Complaint properly alleges

that on April 18, 2003, Bottcher and Dorjee became aware of red flags that should have alerted them to the real reason for the steep decline in VDM Specialists' and VDM Holding's revenues.

Based on the foregoing, it is determined that the Complaint adequately alleges that from December 26, 2001 to the end of the Class Period, VDM Specialists knew of or recklessly disregarded fraudulent trading practices and resulting misleading revenue figures. The Complaint also adequately alleges that from April 10, 2002 to the end of the Class Period, VDM Holding recklessly disregarded red flags as to the likely false and misleading nature of VDM Specialists' revenue figures. With respect to Cleaver, recklessness has been adequately alleged for the period from April 10, 2002 until the end of the Class Period. With respect to Rondeltap, recklessness has been adequately alleged for the period from April 9, 2003 until the end of the Class Period. With respect to Bottcher and Dorjee, recklessness has been adequately alleged for the period from April 18, 2003 to the end of the Class Period.

### 2. The Complaint Adequately Alleges That VDM Holding and the Individual Defendants Had Motive To Commit Fraud

Plaintiffs also argue that with respect to VDM Holding and the Individual Defendants, the Complaint establishes scienter by properly alleging that they had motive and opportunity to commit fraud. It is undisputed that VDM Holding and the Individual Defendants had opportunity to commit fraud. What is disputed is whether the Complaint properly alleges that they had motive to commit fraud. The Second Circuit has stated that:

[s]ufficient motive allegations " 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.' " *Novak*, 216 F.3d at 307·(quoting *Shields*, 25 F.3d at 1130). Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud. *Novak*, 216 F.3d at 307–08. Insufficient motives, we have held, can include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation. *Id.* (citing cases). On the other hand, we have held motive sufficiently pleaded where plaintiff alleged that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares. *Id.* (citing cases).

*Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.2001).

Here Plaintiffs have put forward three motive allegations: (1) the importance of VDM Specialists' revenues to VDM Holding's revenue growth, (2) VDM Holding's pressure on Cleaver and Rondeltap to increase VDM Specialists' revenue; and (3) artificially inflating stock prices to fulfill VDM Holding's plan to grow by acquisition.

With respect to the first allegation of motive, it is well established that allegations concerning a defendant's desire to " 'sustain the appearance of corporate profitability' " are not legally sufficient to plead motive to commit securities fraud. *See Novak*, 216 F.3d at 307 (quoting *Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir.1996)). Therefore, allegations concerning the importance of VDM Specialists' revenue to VDM Holdings revenue growth, without more, are inadequate to properly plead motive to commit fraud.

Plaintiffs also argue that courts have found motive properly plead where it was

alleged that a parent company pressured a subsidiary to produce profits. *See Kidder Peabody,* 1995 WL 590624, at *5. The *Kidder Peabody* court held that plaintiffs' allegations that a corporate subsidiary "wanted to show [its parent] that [it] was capable of being profitable" were adequate to allege motive to commit fraud on the part of the subsidiary. *Id.* In a later decision in the same case, the Court restated its earlier holding somewhat, explaining that it had previously found that motive is properly pled where it is alleged that a parent exerted pressure on its subsidiary to produce profits. *In re Kidder Peabody Sec. Litig.,* 10 F.Supp.2d 398, 417 (S.D.N.Y.1998).

Here, Plaintiffs have alleged no facts to demonstrate that VDM Holding exerted pressure of any sort on VDM Specialists or on Cleaver or Rondeltap. Rather, Plaintiffs merely reiterate the unremarkable fact that proprietary trading was the most profitable aspect of VDM Specialists' operation. Such allegations, without more, do not amount to evidence of parent pressure, and as such, are not sufficient to plead that VDM Holding or the Individual Defendants had a motive to commit fraud.

■ Finally, Plaintiffs have alleged that, since the mid–1990s, the specialist industry has gone through a period of consolidation, which has reduced the number of firms serving as NYSE specialists from thirty-eight in 1997 to approximately nine at the time that VDM Holdings first listed ADRs on the NYSE. In its registration statement, VDM Holding warned that as a result of this consolidation, its future profitability would rely on its ability to acquire additional specialist firms in a market populated with competitors that had greater access to capital. Specifically, VDM Holding stated:

> [O]ur current and potential competitors have established or may establish other co-operative relationships or may consolidate to enhance their services. This trend is evidenced in particular by the rapid consolidation of [NYSE] specialists, the number of which has fallen from 37 as of December 31, 1996 to nine as of September 30, 2001, assuming all publicly announced acquisitions are completed. Three of the top five of these specialists are owned or affiliated with banking groups which have significantly greater financial resources than we do and three of the top five are affiliated with investment banks which act as underwriters on the initial public offerings of companies seeking to list on the [NYSE]. As a result of this consolidation, there are now fewer potential acquisition targets among the remaining specialist firms, which could hinder our growth.

*See* 10/15/01 20–F Registration Statement, at 17 (stating that "there are now fewer potential acquisition targets among the remaining specialist firms, which could hinder our growth"). Furthermore, in VDM Holding's press release announcing the listing of its ADRs on the NYSE, Bottcher stated it was VDM Holding's intention to use its shares for the acquisition of additional specialist firms:

> Today's listing on the New York Stock Exchange affirms our strong commitment to Wall Street and to the U.S. financial markets, which account for some 70% of Van der Moolen's revenues. We will use our higher U.S. market visibility to increase investor appreciation of the company's clear value attractions and *as a potential currency for future acquisitions.*

Press Release, VDM Holding, "Van der Moolen ADRs begin trading on New York Stock Exchange" (Oct. 18, 2001). Finally, VDM Holding's 2003 20–F report states that between June 2000 and March 2002, it acquired four specialist firms, one of

which—Lyden, Dolan, Nick & Co., LLC—was acquired during the Class Period. *See* 06/27/03 20–F Annual Report, at 42.

Drawing all reasonable inferences in Plaintiffs' favor, these statements properly allege that: (1) during the Class Period, VDM Holding was engaged in a program of strategic acquisitions designed to maintain its position in a market undergoing unprecedented consolidation; (2) VDM Holding intended to use its shares to finance some or all of these acquisitions; (3) VDM Holding's competitors were also engaged in programs of strategic acquisitions during the Class Period; (4) at least some of these competitors had access to substantially greater capital than VDM Holding; and (5) in light of its lesser resources, VDM Holding was under acute pressure to maintain the value of its shares in order to maximize its ability to acquire other specialist firms.

Such allegations adequately allege that VDM Holding was motivated to artificially inflate the value of its shares in order to maximize the use of those shares as currency for acquisitions. *See Rothman,* 220 F.3d at 93–94 (stating that "[w]hether sufficient motive could be shown solely by an allegation of a high stock price artificially maintained in the context [of an] impending acquisition might well depend on the particular circumstances of the case, and … is not the issue before us"); *In re Interpublic Securities Litigation,* No. 02 Civ. 6527(DLC), 2003 WL 21250682, at *10 (S.D.N.Y. May 29, 2003) (stating that "[w]hile the simple purchase of one company by another may not ordinarily provide a sufficient allegation of a motive to commit fraud, a sustained and extensive plan to grow by acquisition, particularly through

scores of acquisitions paid for with a company's stock, as alleged here, may").

The *Interpublic* court held that "the complaint sufficiently allege[d] that [the company's] decision to grow by acquisition motivated [it] to inflate its reported earnings over the same period in order to have a higher stock price than it would otherwise have had." [10] *Id.* at *12. In so holding, the *Interpublic* court noted that the complaint contained allegations that the defendants had engaged in a "sustained multi-year program of acquisition," and it alleged that the misstatements of financial results were made over the course of the same years.

Similarly, here it is alleged that VDM Holding began a program of acquisition in 2000 that continued on throughout the Class Period, and it is alleged that the misstatements concerning the earnings of VDM Holding and VDM Specialists were made during this same time period.

Based on the foregoing, it is determined that Plaintiffs have adequately alleged that VDM Holding had motive and opportunity to commit fraud.

## II. The Complaint States A Section 20(a) Claim Against VDM Holding and The Individual Defendants

Count Two of the Complaint asserts that VDM Holding and the Individual Defendants violated Section 20(a) of the Exchange Act. Section 20(a) imposes joint and several liability on any person who "controls any person liable under any provision of this title or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). In order to state a claim based on control person liability under Section 20(a), a plaintiff must allege "(1) a primary viola-

**10.** It should be noted that the *Interpublic* court held that the allegations concerning the company's program of acquisitions were suffi-

cient to plead motive to commit fraud on the part of both the company and also on the part of the individual defendants.

tion by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996)); *Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475(SHS), 2002 WL 244597, at *7 (S.D.N.Y. Feb.20, 2002) (applying "culpable participation" requirement at pleading stage); *In re Emex Corp. Sec. Litig.*, No. 01 civ. 4886(SWK), 2002 WL 31093612, at *9 (S.D.N.Y. Sept. 18, 2002) (same).

 In order to plead control person liability under Section 20(a), a plaintiff must "allege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud". *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir.2001) (holding that plaintiffs had stated a Section 20(a) claim against defendant bank where it was alleged that: (1) the person who had committed the alleged violation of Section 10(b) was an officer of the bank, and (2) the officer was responsible for the bank's relationship with a venture whose securities were the subject of the alleged Section 10(b) violation).

Here, it is alleged that the Individual Defendants acted as controlling persons of VDM Holding and VDM Specialists, and it is alleged that VDM Holding acted as a controlling person of VDM Specialists.

With respect to acting as controlling persons of VDM Specialists, VDM Holding and the Individual defendants argue that no control person liability can arise because no claim for a primary violation of Section 10(b) has been stated against VDM Specialists. Since it has been determined that the Plaintiffs have stated a Section

10(b) claim against VDM Specialists, this argument fails.

 With respect to whether they are liable as controlling VDM Holding and VDM Specialists, the Individual Defendants have argued, relying on *Kalnit v. Eichler*, 85 F.Supp.2d 232 (S.D.N.Y.1999), *aff'd* 264 F.3d 131 (2d Cir.2001), that a person is either a "control person" or a "primary violator" under section 20(a), but cannot be both. In *Kalnit*, the plaintiff sought to hold the individual directors of the corporate defendant liable as control persons for misrepresentations and omissions that they themselves were alleged to have made. *See Kalnit*, 85 F.Supp.2d at 245. In order to establish liability under section 20(a) as to the individual defendants in that case, the plaintiff necessarily would have had to establish those very defendants' liability as primary violators. *See id.* The court concluded, therefore, that, "under plaintiff's own theory, the Directors could not be control persons and section 20(a) does not apply." *Id.*

Although *Kalnit* casts doubt on Plaintiffs' argument that a defendant could ultimately be held liable as both a primary violator under Section 10(b) and as a control person of another primary violator pursuant to Section 20(a) with regard to the same underlying conduct, the logical inconsistency that required dismissal of the Section 20(a) claim in *Kalnit* is not present here, where multiple misrepresentations and omissions by various of the Defendants have been alleged, and it is conceivable that one defendant ultimately might be found to be a primary violator while another defendant might be found to be a control person under Section 20(a). As the Federal Rules of Civil Procedure permit the pleading of claims in the alternative, *see* Fed.R.Civ.P. 8(e)(2), Plaintiffs are not precluded from pleading that the

Defendants are both primary violators and control persons.

 Finally, Defendants argue that Plaintiffs have failed to carry their burden of alleging particularized facts showing culpable participation in an underlying Section 10(b) fraud. In order to state a Section 20(a) claim, no such particularized allegations are required. *See In re World-Com, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 415 (S.D.N.Y.2003) (stating that "[t]he concept of culpable participation describes that degree of control which is sufficient to render a person liable under Section 20(a). At the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard.") Here, it is alleged that the Individual Defendants exercised direct day-to-day management of VDM Holding and VDM Specialists, and that they had responsibility for their statements to the public. Pursuant to the Second Circuit's holding in *Suez*, such allegations are adequate to state a Section 20(a) claim.

Based on the foregoing, it his determined that Plaintiffs have stated a Section 20(a) claim against the Individual Defendants and VDM Holding.

### Conclusion

Plaintiffs have adequately alleged a Section 10(b) claim against VDM Specialists, and their motion to dismiss the Complaint is denied.

Plaintiffs have adequately alleged a Section 10(b) claim and a Section 20(a) claim against VDM Holding, and their to dismiss the Complaint is denied in its entirety.

As to Count I, the Individual Defendants' motion to dismiss is granted in part and denied in part. With respect to Bottcher and Dorjee, the Complaint states a Section 10(b) claim only as to those statements made on or after April 18, 2003. With respect to Cleaver, the Complaint states a Section 10(b) claim only as to those statements made on or after April 10, 2002. With respect to Rondeltap, the Complaint states a Section 10(b) claim only as to those statements made on or after April 9, 2003.

As to Count II, VDM Holding and the Individual Defendants' motion to dismiss the Complaint is denied.

Leave to replead within thirty (30) days of entry of this opinion is granted.

It is so ordered.

### APPENDIX

### Alleged False And Misleading Statements Made During The Class Period

**1. *The October 15, 2001 Registration Statement***

On October 15, 2001, VDM Holding filed with the SEC a Form 20–F registration statement pursuant to Section 12(b) of the Exchange Act. On October 18, 2001, VDM Holding announced that it would list its ADRs on the NYSE. More specifically, the Form 20–F registration statement, which was signed by Bottcher and Dorjee, stated that shares of VDM Holding common stock would trade in the form of ADRs under the ticker symbol VDM, with one ADR representing one VDM Holding ordinary share trading on Euronext Amsterdam.

The October 15, 2001 registration statement contained the following statements, which are alleged to be false and misleading:

> Our revenues from specialist activities consist primarily of net gains from principal transactions in securities for which our subsidiaries, principally Van der Moolen Specialists USA and Van der Moolen Effecten, act as specialist. Net gain on principal transactions represents trading gains net of trading losses and

transaction fees, and are earned by these subsidiaries when they act as principal buying and selling their specialist stocks.

\* \* \* \* \* \*

Van der Moolen Specialists USA, in which we hold a 75% interest, is our largest subsidiary in terms of contribution to our revenues. It is one of the leading specialist firms on the New York Stock Exchange in terms of profitability,

capital devoted to specialist services, revenue and number of specialist assignments, according to data provided by the New York Stock Exchange. For the year ended December 31, 2000 and the six months ended June 30, 2001, Van der Moolen Specialists USA accounted for EUR289.9 million and EUR128.9 million, or 64.3% and 72.1%, respectively, of our total revenues.

\* \* \* \* \* \*

Revenues for the Years Ended December 31, 1999 and 2000
(EUR millions, except percentages)

| Company | Year Ended 12/31/99 | % Total Revenue | Year Ended 12/31/99 | % Total Revenue | Year on Year Change |
|---|---|---|---|---|---|
| Van der Moolen Specialists USA, LLC | 143.1 | 63.7% | 289.9 | 64.3% | 103% |
| Van der Moolen Trading GmbH | 28.2 | 12.5 | 73.9 | 16.4 | 162 |
| Van der Moolen Effecten Specialist B.V. | 34.0 | 15.1 | 54.8 | 12.2 | 61 |
| Tague Van der Moolen, LLC | 8.8 | 3.9 | 16.0 | 3.5 | 82 |
| Van der Moolen Opties Amsterdam B.V. | 6.0 | 2.7 | 4.5 | 1.0 | (25) |
| Van der Moolen U.K., Ltd. | 1.2 | 0.5 | 6.7 | 1.5 | 458 |
| Van der Moolen Obligaties B.V. | 3.7 | 1.6 | 5.0 | 1.1 | 35 |
| Total | 225.0 | 100.0% | 450.8 | 100.0% | 100% |

\* \* \* \* \* \*

Our businesses are exposed to substantial risks of liability under federal and state securities laws, other federal and state laws and court decisions, as well as rules and regulations promulgated by the Securities and Exchange Commission, the New York Stock Exchange and similar regulatory authorities and self-regulatory organizations in the United States and Europe, as well as national and local legislation in various European jurisdictions.

\* \* \* \* \* \*

Our businesses and the securities industries in which they operate are subject to an extensive range of laws, rules and regulation in the United States and Europe that are promulgated by various governmental agencies and self-regulatory organizations. The laws, rules and regulations with which our businesses must comply include those relating to financial reporting requirements, trade practices, capital structure requirements, and record retention requirements governing the conduct of our directors, officers and employees. Failure to comply with any of these laws, rules or regulations could result in censure, fine, the issuance of cease-and-desist orders or the suspension or disqualification of our directors, officers or employees, and other adverse consequences, which could have an adverse effect on our business. It could also result in the suspension or disqualification of whichever of our subsidiaries commits the violation by the SEC or other relevant regulatory authority or in that subsidiary's suspension or disqualification as a member of the securities exchange on which it operates. If this occurred, we would be unable to operate a portion of our business which could potentially be significant.

\* \* \* \* \* \*

Under the New York Stock Exchange rules, a specialist has a duty to maintain, as far as practicable, a fair and orderly market in its specialist stocks. In order to fulfill its obligations, the specialist must at times trade for its own account, even when doing so may adversely affect the specialist's profitability. In addition, under some circumstances, the specialist is prohibited from making trades as principal in its specialist stocks. As part of the price discovery mechanism implemented by the New York Stock Exchange, every specialist transaction is published immediately on the tape and is broadcast to the general public. The New York Stock Exchange's Market Surveillance Division examines specialists' trading in all stocks, every trading day, including specialists' decisions to trade or to not trade as principal. The specialist's obligations are briefly described below.

*Requirement to trade as principal.* A specialist must buy and sell securities as principal when necessary to minimize an actual or reasonably anticipated short-term imbalance between supply and demand in the auction market. The specialist must effect these transactions when their absence could result in an unreasonable lack of continuity and/or depth in their specialist stocks. The specialist is not expected to act as a barrier in a rising market or a support in a falling market, but must use its own judgment to try to keep such price increases and declines equitable and consistent with market conditions.

A specialist must make firm and continuous two-sided quotations that accurately reflect market conditions. In making

these quotations, the specialist's transactions are calculated to contribute to the maintenance of price continuity with reasonable depth.

\* \* \* \* \* \*

*Trading restrictions.* In trading for its own account, the specialist must avoid initiating a market-destabilizing transaction. All purchases and sales must be reasonably necessary to permit the specialist to maintain, as far as practicable, a fair and orderly market in its specialist stocks. In addition, the specialist must comply with the following trading requirements:

- A specialist must first satisfy a customer's market buy order (an order to buy at the prevailing market price) before buying any stock for its own account. Similarly, a specialist must first satisfy a customer's market sell order (an order to sell at the prevailing market price) before selling any stock for its own account.

- A specialist must first satisfy a customer's limit order held by it before buying or selling at the same price for its own account. A limit order is an order either to buy only at or below a specified price, or to sell only at or above a specified price.

- If a public buyer wants to buy at a particular price and a seller wants to sell at the same price, the buyer and seller trade directly with each other, and the specialist should not interfere in the transaction.

- The specialist does not charge commissions for trades that are matched by the Automated Order Routing System within five minutes from the time the order is taken.

- Except in some circumstances in less active markets, the specialist may not, without permission from a New York Stock Exchange official, initiate "destabilizing trades" as defined in the New York Stock Exchange Rules for its own account which cause the stock price to rise or fall.

- Any transactions by the specialist for its own account must be effected in a reasonable and orderly manner in relation to the condition of the general market, the market in the particular stock and the adequacy of the specialist's position to the immediate and reasonably anticipated needs of the market.

- The specialist cannot be in a control relationship with any of its listed companies. This means a specialist may not generally acquire more than 10% of any equity security in which the specialist is registered. Further, a specialist must report holdings of such securities of 5% or more of the outstanding issue, and the New York Stock Exchange may require the firm to divest itself of such holdings. A specialist may not hold any position as an officer or director or receive payments or loans or engage in business transactions with any of the listed companies in respect of which it acts as specialist.

(10/15/01 20–F Registration Statement, at 49, 27, 58, 16, 21, 37, 37–49.)

### 2. *The October 18, 2001 Press Release*

Plaintiffs allege that the press release issued by VDM Holding on October 18, 2001 contained the following false and misleading statement by Bottcher:

Today's listing on the New York Stock Exchange affirms our strong commitment to Wall Street and to the U.S. financial markets, which account for some 70% of Van der Moolen's revenues. We will use our higher U.S. market

visibility to increase investor appreciation of the company's clear value attractions and as a potential currency for future acquisitions.

(Press Release, VDM Holding, "Van der Moolen ADRs begin trading on New York Stock Exchange" (Oct. 18, 2001).) [1]

### 3. The Third Quarter 2001 Earnings Release

Plaintiffs allege that the following statements, contained in the VDM Holdings earnings release issued October 31, 2001, were false and misleading:

> Van der Moolen (N.Y.SE: VDM), a specialist and market maker on the major U.S. and European equity, options and bond markets, today announced that its net income from ordinary activities for the first nine months of 2001 was Euro 73.1 million, 27% lower than in the same period of 2000.
>
> Income from ordinary activities per common share in the first nine months of 2001 was Euro 1.90, 30% lower than the Euro 2.72 earned in the first nine months of 2000. Ninety percent of trading days in the first nine months of 2001 were closed with a positive trading result.
>
> In the third quarter of 2001, net income from ordinary activities was Euro 19.2 million, 34% lower than in the same quarter of the previous year. Earnings per common share from ordinary activities declined by 37%, from Euro 0.78 in 2000 to Euro 0.49 in the current year. Eighty-five percent of trading days closed profitably during the third quarter.

(Press Release, VDM Holding, "Van der Moolen: Net Income of Euro 73.1 Million

for the First Nine Months of 2001" (Oct. 31, 2001).)

Plaintiffs also allege that the following statement by Bottcher in the October 31, 2001 press release was false and misleading:

> The third quarter was clearly not the easiest one we have seen, given the tragic events of September 11 and the unusually slow summer months preceding them. In particular, our options activities came under pressure. Nevertheless, it is worth stressing in these difficult times that we are achieving healthy results and we are satisfied with the more than Euro 19 million we were able to earn in these circumstances. The revenue picture in October gives us confidence that we will reach our indicated net income from ordinary activities of approximately Euro 100 million for the full year, which would make 2001 Van der Moolen's second-best year ever.

(*Id.*)

### 4. The March 7, 2002 Earnings Release

Plaintiffs allege that the following statements, contained in the VDM Holdings earnings release issued March 7, 2002, were false and misleading:

> Van der Moolen (N.Y.SE: VDM), ... a specialist and market making firm active on the important U.S. and European equity, option and bond exchanges, achieved net income from ordinary activities (before extraordinary items) of EUR 100.7 million in 2001, a 27% decrease from 2000.
>
> Net income from ordinary activities per common share declined by 30% from EUR 3.74 in 2000 to EUR 2.62 in 2001. Of its 258 trading days in 2001, Van der

---

**1.** Unless otherwise noted, the VDM Holding press releases referenced herein, which were disseminated by Business Wire, are available on the LEXIS. These new releases can be found in the File "Wire Service Stories" File, which is located in the "News" Library.

Moolen was able to close 226 of them with a positive trading result.

(Press Release, VDM Holding, "Van der Moolen: Net Income of EUR 100.7 Million in 2001" (Mar. 7, 2002) (footnotes omitted).)

Plaintiffs also allege that the following statement by Bottcher in the March 7, 2002 press release was false and misleading:

2001 was an eventful year for us. Despite difficult market conditions, but also the sharp deterioration of our option activities, we achieved our second best earnings on record, with net income a little above EUR 100 million. We strengthened the firm further during 2001 with three acquisitions in the US, and our European equity and bond trading activities are developing favorably.

(*Id.*)

### 5. *The FY 2001 Annual Report*

The Plaintiffs allege that Van der Moolen Holding's 2001 annual report, which was signed by Bottcher, Dorjee, and Cleaver, contained false and misleading statements. First, the 2001 annual report reaffirmed the financial results previously announced in the March 7, 2002 earnings release.

Furthermore, Plaintiffs allege that the following statement by Pricewaterhouse-Coopers N.V., VDM Holding's independent auditor, was false and misleading:

In our opinion, the accompanying consolidated statements of financial condition and the related consolidated statements of income, comprehensive income, shareholders' equity and cash flows present fairly, in all material respects, the financial position of Van der Moolen Holding N.V. and its subsidiaries at December 31, 2001 and 2000, and the results of

their operations and their cash flows for each of the three years in the period ended December 31, 2001, in conformity with accounting principles generally accepted in the United States of America.

(05/18/02 Form 20–F Annual Report, at F–1.)

Plaintiffs have also identified the following allegedly false and misleading statements:

We derive a substantial majority of our revenues 63.6%, 63.4% and 78.5% of total revenues in 1999, 2000 and 2001, respectively from our New York Stock Exchange specialist subsidiary, Van der Moolen Specialists USA. If demand for its specialist services fails to grow or declines, our potential revenue growth would be adversely affected.

\* \* \* \* \* \*

The majority of our specialist and market making revenues are derived from trading by our subsidiaries as principal. Our subsidiaries may incur trading losses relating to these activities, since each primarily involves the purchase, sale or short sale of securities for its own account. In any period, our subsidiaries may incur trading losses in a significant number of securities for a variety of reasons, including as a result of the required performance of some of our subsidiaries' specialist obligations.

(*Id.* at 14, 15.) In addition, Plaintiffs identified statements concerning regulatory and litigation liability and the duties and obligations of an specialist that were substantially similar to previously described statements contained in the October 15, 2001 Registration Statement.

### 6. *First Quarter 2002 Earnings Release*

Plaintiffs allege that the following statements, contained in the VDM Holdings earnings release issued May 1, 2002, were false and misleading:

Van der Moolen ..., a specialist and market maker in leading U.S. and European equity, option and fixed income markets, realized net income from ordinary activities of Euro 17.7 million in the first quarter of 2002, a decline of 43% compared with the first quarter of 2001. Net income from ordinary activities per common share was Euro 0.45, a decrease of 44% from the first quarter of 2001. Of the 62 trading days in the quarter, Van der Moolen closed 60(97%) of them with a positive trading result.

\*　　\*　　\*　　\*　　\*　　\*

Net income per common share from ordinary activities, calculated on the basis of weighted average common shares outstanding and after deduction of dividends on preferred shares, came to Euro 0.45, a decrease of 44% below the Euro 0.81 earned in the first quarter of 2001.

(Press Release, Van der Moolen Holding, "Van der Moolen Reports Net Income From Ordinary Activities Of Euro 17.7 Million in the First Quarter of 2002" (May 1, 2002).)

Plaintiffs also allege that the following statement by Bottcher in the May 1, 2002 press release was false and misleading:

There has been no recovery in equity markets to date. Weak turnover and restricted volatility limit trading opportunities for a firm such as ours. With limited exceptions, our trading revenues are down across the board, most notably in European equity markets. Given current uncertainties in the market, it is not

possible at this stage to provide a forecast for the full year.

(*Id.*)

### 7. Form 6–K For May 3, 2002

Plaintiffs argue that the following statement from Defendants' May 3, 2002 Form 6–K disclosure was false and misleading:

**VDM Specialists Revenue** ($ Million)

| | Q1 2002 | Q1 2001 |
| --- | --- | --- |
| **Total Revenue** | 56.9 | 65.4 |
| Net Gain On Principal Transactions | 47.7 | 53.4 |
| Commissions | 7.1 | 7.2 |
| Other | 2.1 | 4.8 |
| \* \* \* | | |
| Participation Rate [2] | 34.9% | 31.5% |

(05/03/02 Form 6–K, at 5.)

### 8. Second Quarter 2002 Earnings Release

Plaintiffs allege that the following statements, contained in the VDM Holdings earnings release issued August 1, 2002 were false and misleading:

Van der Moolen, a specialist and market maker on the leading U.S. and European equity, option and fixed income markets, realized net income from ordinary activities of $16.9 million in the second quarter of 2002, a 27% decrease compared to the same period of the previous year and a 5% decrease relative to the first quarter of 2002. Net income from ordinary activities per common share was $0.42, which was 29% less than in the second quarter of 2001 and 5% lower than in the first quarter of the current year.

VDM Specialist acted as a counterparty.

**2.** The Complaint defines "participation rate" as the percentage of transactions in which

Of the 65 trading days in the second quarter, Van der Moolen closed 62 of them, or 95%, with a positive trading result.

(Press Release, VDM Holding, "Van der Moolen earns second quarter, 2002 net income of $16.9 million" (Aug. 1, 2002), *reprinted in* the 08/08/02 Form 6–K, at 1.)

Plaintiffs also allege that the following statement by Bottcher in the August 1, 2002 press release was false and misleading:

> In exceedingly turbulent market circumstances we were able to maintain our second quarter result at almost the level we achieved in the first quarter. The development of our NYSE business showed once again that trading volumes and price volatility determine our opportunities to trade. Given the current uncertainties as to the outlook for financial markets in the second half of 2002, we think it would be premature to make any forecast of our earnings for the full year.

(*Id.* at 2.)

### 9. *August 8, 2002 Form 6–K*

Plaintiffs argue that the following statement from Defendants' May 3, 2002 Form 6–K financial disclosure was false and misleading:

**VDM Specialists Revenue** ($ Million)

| | Q2 2002 | Q2 2001 | Q1 2002 |
| --- | --- | --- | --- |
| Total Revenue | 66.4 | 51.7 | 56.9 |
| Net Gain On Principal Transactions | 55.8 | 41.6 | 47.7 |
| Commissions | 8.3 | 6.1 | 7.1 |
| Other | 2.3 | 4.0 | 2.1 |

\* \* \*

| Participation Rate (%) | 34.5 | 32.1 | 34.9 |
| --- | --- | --- | --- |

\* \* \* \* \* \*

Van der Moolen Specialists USA's revenues rose 22% compared to the second quarter of 2001, as a result of the acquisitions of Stern & Kennedy and Scavone, McKenna, Cloud in July, 2001 and the acquisition of Lyden, Dolan, Nick in March, 2002. By comparison to the first quarter of 2002, its revenues were up by 11%, as a result of organic growth, as well as a full three months' consolidation of Lyden, Dolan, Nick (compared to only one month included in the earlier period). Van der Moolen Specialists USA closed every trading day of the second quarter with a positive trading result.

(05/03/02 6–K, at 6, 2.)

### 10. *October 16, 2002 Earnings Release*

Plaintiffs allege that the following statements contained in VDM Holding's October 16, 2002 press release were false and misleading:

> Van der Moolen ... announces that it expects net income from ordinary activities under Dutch GAAP for the third quarter of 2002 to be approximately EUR 17.2 million.

> This compares to EUR 16.9 million in the second quarter of this year and to EUR 19.2 million in the third quarter of 2001. On November 7, 2002, we will issue detailed Dutch GAAP financial information regarding our results for the quarter as well as selected U.S. GAAP figures.

> Total revenues in the third quarter were roughly at the same level as in the second quarter of the current year. The earnings of our American options trading activities improved relative to the second quarter of 2002, but revenues remained slightly negative.

[ ] Bottcher ... remarked: "Our specialist and market making operations on the NYSE and on the European equity exchanges developed in line with volume and volatility in those markets, with July in particular producing outstanding results. Despite the measures we have already taken to improve our U.S. option activities, they did not yet make a positive revenue contribution in the third quarter."

(Press Release, VDM Holding, "Van der Moolen Expects Third Quarter Net Income of Approximately EUR 17.2 Million" (Aug. 1, 2002).)

### 11. *Third Quarter 2002 Earnings Release*

Plaintiffs allege that the following statements, contained in the VDM Holdings earnings release issued November 7, 2002 were false and misleading:

In the third quarter[,] 81% of revenues were generated in the U.S., compared with 82% in the third quarter of 2001 and 79% in the second quarter of 2002.

The revenues of [VDM Specialists] rose 9% compared with the prior year, largely as a result of the acquisitions of Stern Kennedy and Scavone in 2001 and the acquisition of Lyden in 2002. Compared with the second quarter of 2002, they declined by 3%, entirely as a result of translation into Van der Moolen's reporting currency: in constant currency they would have risen 4%. With one loss-making day in July, Van der Moolen Specialists USA closed 98% of its trading days with a positive trading result in the third quarter of 2002.

\* \* \* \* \* \*

**VDM Specialists Revenue ($ Million)** [3]

| | Q3 2002 | Q3 2001 | Q2 2002 |
|---|---|---|---|
| **Total Revenue** | 69.0 | 57.6 | 66.4 |
| Net Gain On Principal Transactions | 58.1 | 48.0 | 55.8 |
| Commissions | 8.4 | 6.9 | 8.3 |
| Other | 2.5 | 2.7 | 2.3 |
| | \* \* \* | | |
| Participation Rate (%) | 34.7 | 31.4 | 34.5 |

\* \* \* \* \* \*

(Press Release, VDM Holding, "Van der Moolen: Net Income of EUR 17.2 Million in the Third Quarter of 2002" (Nov. 7, 2002).) Plaintiffs also allege that the following statement by Bottcher in the November 7, 2002 press release was false and misleading:

Our equity trading teams again showed outstanding performance. On the NYSE we achieved an improvement in revenues and margins under turbulent market conditions, in line with the development of exchange volumes and the development of intra-day price volatility during the quarter. Underlying U.S. growth was to some degree offset in our reported results by the depreciation of the U.S. dollar versus the euro. All of our European equity trading units were profitable. Trading results from our U.S. option units were still negative, but showed an improvement over the previous quarter. Given the current uncertainties about market developments in a year that has seen a break from the

---

**3.** Paragraph 112 of the Complaint is inaccurate. The figures stated in that paragraph should have been expressed in Euros and not U.S. Dollars.

normal seasonal trading patterns, we will give no forecast for the full year. (*Id.*)

### 12. *February 19, 2003 Press Release*

Plaintiffs allege that the following statements contained in VDM Holding's February 19, 2003 press release were false and misleading:

Van der Moolen, specialist and market maker on the most important American and European equity, option and fixed income platforms, announced that it expects to earn net income for the fourth quarter of 2002 of approximately (EUR) 16.8 million, before an impairment charge of (EUR) 10.1 million in relation to our options activities.

Net income for the full year 2002 before impairment charges is expected to be (EUR) 68.6 million.

If market conditions experienced this year to date persist, first quarter 2003 net income is expected to be lower than net income before impairment charges in the fourth quarter 2002.

(Press Release, VDM Holding, "Van der Moolen Pre–Announcement of Fourth Quarter 2002 Results" (Feb. 19, 2003).) Plaintiffs also allege that the following statement by Bottcher in the February 19, 2003 press release was false and misleading:

Market volume and volatility limited the trading opportunities available to us in the fourth quarter, resulting in lower results from principal activities. The weakening of the dollar against the euro also had a negative translation effect on our reported results. Although we achieved a further improvement in the earnings of our U.S. option activities,

given the change in market structures, we have taken an impairment charge on these two firms.

(*Id.*)

### 13. *FY 2002 Earnings Release*

Plaintiffs allege that the following statements contained in the VDM Holding earnings release issued March 5, 2003 were false and misleading:

[VDM Holding] ... earned net income from ordinary activities (before impairment charges) of EUR 68.6 million in 2002, a decrease of 32% compared with 2001. The write-down taken in the final quarter of the year concerns an impairment loss on the intangible fixed assets of Cohen, Duffy, McGowan, and amounted to EUR 10.1 million after tax. This brought net income for the full year to EUR 58.5 million.

Net income from ordinary operations before impairment charges per common share declined by 33% from EUR 2.56 in 2001 to EUR 1.71 in 2002.

Of [the] 255 trading days in 2002, [VDM Holding] closed 245 or 96% of them with a positive trading result.

\* \* \* \* \* \*

**VDM Specialists Revenue** ($ Million) [4]

| | Q4 2002 | Q4 2001 | Q3 2002 |
|---|---|---|---|
| **Total Revenue** | 59.7 | 61.8 | 69.0 |
| Net Gain On Principal Transactions | 49.0 | 51.6 | 58.1 |
| Commissions | 7.8 | 7.5 | 8.4 |
| Other | 2.9 | 2.7 | 2.5 |

\* \* \*

Participation

---

4. Paragraph 112 of the Complaint is inaccurate. The figures stated in that paragraph should have been expressed in Euros and not U.S. Dollars.

| Rate (%) | 34.4 | 30.7 | 34.7 |
| --- | --- | --- | --- |

(Press Release, VDM Holding, "Van der Moolen: net income of EUR 58.5 million in 2002, after a net impairment charge of EUR 10.1 million" (Mar. 5, 2003).) Plaintiffs also allege that the following statement by Bottcher in the March 5, 2003 press release was false and misleading:

> "The new year has presented us with notable challenges. In the current market climate, characterized by further equity price declines, continued weakness in investor confidence and the threat of war, we are confronted by declining market turnover and margin erosion, which have significantly affected our revenues. As a consequence, we have embarked on a further program of cost reductions. Given the uncertainty in the markets where we are active, we decline to offer a forecast for the first quarter as well as for the full year."

(*Id.*)

**14. *FY 2002 Annual Report***

Plaintiffs allege that VDM Holding's 2002 annual report, which was signed by Bottcher, Dorjee, Cleaver, and Rondeltap, contained false and misleading statements. First, the 2001 annual report reaffirmed the financial results previously announced in the March 6, 2003 earnings release.

Furthermore, Plaintiffs allege that the following statements were false and misleading:

> We prepare our financial statements on a consolidated basis in accordance with accounting principles generally accepted in the United States of America ("U.S.GAAP"). U.S. GAAP selected consolidated financial information as of and for the years ended December 31, 2000, 2001 and 2002, together with our U.S. GAAP financial statements and the notes thereto as of and for the years ended December 31, 2000, 2001 and

2002, are set forth elsewhere in this annual report.

\* \* \* \* \* \*

> Within the 90–day period prior to the filling of this Annual Report, an evaluation was carried out under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a–14(c) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of these disclosure controls and procedures were effective. No significant changes were made in our internal controls or in other factors that could significantly affect these controls subsequent to the date of their most recent evaluation.

(06/27/03 Form 20–F Annual Report, at 3, 108.) In addition, Plaintiffs have identified alleged misstatements concerning regulatory and litigation liability and the duties and obligations of a specialist that were substantially similar to previously described statements contained in the October 15, 2001 Registration Statement. Finally, the 2002 Annual Report contained certifications signed by Bottcher and Dorjee that represented that the 2002 annual report did not contain any false or misleading statements.

**15. *The April 9, 2003 Press Release***

Plaintiffs allege that the following statements contained in VDM Holding's April 9, 2003 press release were false and misleading:

> [VDM Holding] ... announced that in the first quarter of 2003 it realized net income from ordinary activities of about EUR 7.9 million, including a net gain of

EUR 1.9 million on the sale of its equity interest in Tullett Plc.

In the first quarter of 2003, [VDM Holding] was able to close 62, or 98%, of its 63 trading days with a positive trading result. On the NYSE, VDM Specialists achieved a trading profit on every trading day of the quarter.

(Press Release, VDM Holding, "Van der Moolen Expects Net Income of Approximately EUR 7.9 Million in the First Quarter of 2003" (Apr. 9, 2003).) Plaintiffs also allege that the following statement by Bottcher in the April 9, 2003 press release was false and misleading:

> Increased activity in equity markets led to a slightly better development of results in March, but this was not yet accompanied by an improvement in VDM Specialists' trading margins. Against this background, cost reduction is receiving our full attention. Our ability to close 98% of our trading days with a trading profit indicates that, even in these market conditions, we have been able to maintain our trading disciplines.

(*Id.*)

### 16. *First Quarter 2003 Earnings Release*

Plaintiffs allege that the VDM Holding earnings release issued May 7, 2003, which reaffirmed the financial results reported in the April 9, 2003 press release, contained the following additional false and misleading statements:

> [VDM Holding] ... realized net income from ordinary activities in the first quarter of 2003 of EUR 7.9 million, 55% less than in the first quarter of 2002 and 53% less than in the fourth quarter of 2002 (before the fourth quarter charge for impairment of intangible fixed assets). Included in net income is a net book profit of EUR 1.9 million resulting from the sale of our interest in Tullett Plc.

Net income per common share from ordinary business activities amounted to EUR 0.19, a 58% decrease compared to the first quarter of 2002 and a 55% decrease compared to the fourth quarter of 2002 (before the fourth quarter charge for impairment of intangible fixed assets).

Of the 63 trading days in the first quarter of 2003, [VDM Holding] was able to close 62(98%) with a positive trading result.

\* \* \* \* \* \*

VDM Specialists Revenue ($ Million)

| | Q1 2003 | Q1 2002 | Q4 2002 |
|---|---|---|---|
| **Total Revenue** | 40.7 | 56.9 | 59.7 |
| Net Gain On Principal Transactions | 31.6 | 47.7 | 49.0 |
| Commissions | 7.5 | 7.1 | 7.8 |
| Other | 1.6 | 2.1 | 2.9 |
| | \* \* \* | | |
| Participation Rate (%) | 31.7 | 34.9 | 34.4 |

(Press Release, VDM Holding, "Van der Moolen: Net Income of EUR 7.9 Million in the First Quarter of 2003" (May 7, 2003).) Plaintiffs also allege that the following statement by Bottcher in the March 5, 2003 press release was false and misleading: Despite the increase in share prices in April, we have seen no material improvement in the market environment for our trading operations. Our efforts remain concentrated on risk management and cost reduction. Given current market conditions, we have no comment to make about the outlook for the full year 2003. (*Id.*)

### 17. *Second Quarter 2003 Earnings Release*

Plaintiffs allege that the VDM Holding earnings release issued August 6, 2003

contained the following additional false and misleading statements:

> [VDM Holding] . . . realized net income from ordinary activities of EUR 6.9 million in the second quarter of 2003, 59% less than in the second quarter of 2002 and 13% less than in the first quarter of 2003.
>
> Net income per common share from ordinary business activities was EUR 0.16, a 62% decrease compared to the second quarter of 2002 and a 14% decrease compared to the first quarter of 2003. [VDM Holding] was able to close every trading day (100%) of the second quarter of 2003 with a positive trading result.

\* \* \* \* \* \*

**VDM Specialists Revenue** ($ Million)

| | Q2 2003 | Q2 2002 | Q1 2003 |
|---|---|---|---|
| **Total Revenue** | 39.6 | 66.4 | 40.7 |
| Net Gain On Principal Transactions | 28.9 | 55.8 | 31.6 |
| Commissions | 8.0 | 8.3 | 7.5 |
| Other | 2.7 | 2.3 | 1.6 |
| | \* \* \* | | |
| Participation Rate (%) | 27.7 | 34.4 | 31.7 |

(Press Release, VDM Holding, "Van der Moolen: Net Income of Eur 6.9 Million in the Second Quarter of 2003" (Aug. 6, 2003).) Plaintiffs also allege that the following statement by Bottcher in the August 6, 2003 press release was false and misleading:

> Despite poor market conditions and charges for reorganization and severance that we took in the second quarter of 2003, we showed a 15% improvement in our operating income compared with the first quarter. We believe that the decline in income from our NYSE specialist unit is temporary, while the small improvements we saw in European and option trading should be sustainable. However, we continue to look to improved market conditions to drive a full recovery in our earnings. July witnessed no clear improvement in these conditions compared with the second quarter, but benefits from the cost reductions we have made will be evident in our results for the rest of 2003.

(*Id.*)

18. ***August 7, 2003 Earnings Conference Call***

Plaintiffs allege that representatives of VDM Holdings made the following false and misleading statements during the course of a August 7, 2003 call with securities analysts.

Bottcher stated:

> It should come at no surprise when I say that our trading environment was once again extremely challenging this quarter. Equity markets recovered noticeably, with strong price increases that drove exchange turnover. The increase in share volume, however, was much more modest. We have not seen any significant improvement in dollar values traded so far this quarter. The quality of order flow also affected second quarter results, with the share of trading due to inter-professional activity remaining at high levels. As we found in first quarter, this type of activity doesn't offer us the same margins as so-called natural orders from traditional investors, probably because much of the arbitrage trading, which exploits the same kind of price activity that we seek to benefit from. A large share of trading activity continues to cluster around the market opening, which presents few opportunities for our specialists to participate.

Whether due entirely due to inter-professional activity or not, the very low levels of volatility we saw during the quarter meant that we didn't receive much benefit from the increase in market turnover, and both our ability to participate and our rewards for participation were reduced in the second quarter.

(Q2 2003 Van der Moolen N.V. Earnings Conference Call, Final FD (Fair Disclosure) Wire, at 1 (August 7, 2003).)

Plaintiffs have also alleged that Bottcher and Dorjee made false and misleading statements during the course of this exchange with securities analyst Charlotte Chandoway ("Chandoway").

CHANDOWAY: OK, OK, and then the more vexing issue of the revenues?

DORJEE: Yeah, you still can't understand when I refer to your question in the right way, why, let's say, LaBranch showed quarter to quarter an improvement in the realization rate, and our realization rate was still falling further. It's, in our opinion, also a reflection of the trading style. You know that our trading style, in a certain way, differs from what LaBranch is doing, that can fit maybe better into an environment of, let's stay, a strong recovery in most of the markets in which we operate, and particularly also in the U.S. But in our trading style, with our focus on playing our role intensively within the trading hours, and with the risk appetite we express in that, we think that the outcome of the second quarter is in line with the way we played it in the first quarter, and there was still some improvement in terms of operating results and maybe you have to translate it also back into dollars to get the right picture.

CHANDOWAY: Well, the dollar picture is the same. I mean, the revenues from principle trading went down, and what's vexing for analysts, or at least this analyst, in trying to project forward, is that in looking at pretty much everything, I mean, the dollar volumes of your listings went up. Certainly, you know, it was the best quarter the U.S. markets have seen since the fourth quarter of '01, and to see your revenues from principal trading in dollars goes down, LaBranch or no LaBranch, it puts—it makes the idea of trying to forecast growth, it makes it extremely precarious, because if you're—if everything can be positive, small, but positive, and your revenues go down, you kind of think, "well, gee, if they got positive and big, would they go down again?"

BOTTCHER: You know, we have said in the analyst presentation also something about the quality of order flow and the fact that the order flow on the NYSE, but not only on the NYSE, globally is strongly influenced with elements of program trading. And— which is maybe more important, is the absence of end investors, like retail customers, and to a certain extent, a number of the bigger pension funds and insurance companies, which were normally very active traders.

CHANDOWAY: But that simply isn't true. That simply isn't true. If you look at Ameritrade and E–Trade, the two biggest retail online companies, and Schwab, throughout the June quarter, they reported big, huge increases in retail trading. Also, if you look at the U.S. inflows into stock mutual funds from retail, they were also very, very large, very positive, and ended the quarter with contributions to U.S. stock mutual funds up

over last year, so it's not the absence of retail.

BOTTCHER: But when you look, Charlotte, to the volume increase, also in our stocks, and we gave figures in the presentation, you'll see that over that quarter, in which we saw significant increase in the level of the indexes, that the volume in number of stocks traded was up just 9%, and of those, let's say higher figures, the increase was 9%. A larger share was program trading than in the previous quarter, and that is what we refer to in quote of the order flow, which—pro rata part, the program trading is more dominant than before, and it's a less favorable environment for the way we make markets.

(*Id.* at 6.)